## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**AMANDA BROOKE FERRELL,**

     **Plaintiff,**

**v.**                                     **Case No.:**

**FLORIDA SOCIETY OF**
**HEALTH-SYSTEM PHARMACISTS, INC.,**
**a Florida Corporation,**

     **Defendant.**
_____/

## COMPLAINT

Plaintiff sues Defendant and states:

### JURISDICTION AND VENUE

1.    This action for monetary damages, for declaratory and injunctive relief, and for other equitable and ancillary relief is brought under The Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 and under the common law of Florida.

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claim arises under the laws of the United States.  The Court has jurisdiction of the state-law claims under 28 U.S.C. § 1367.

3.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because

1

Defendant's corporate headquarters is in Tallahassee, Florida.

4.     Plaintiff Amanda Brooke Ferrell ("Plaintiff" or "Ferrell") is a citizen of the United States and a citizen and resident of the State of Florida, who resided in Tallahassee, Leon County, Florida at all times material hereto.

5.     Defendant Florida Society of Health-System Pharmacists, Inc., ("FSHP" or "Defendant"), is a Florida corporation with its headquarters in Tallahassee, Leon County, Florida.

## CONDITIONS PRECEDENT

**6.**     All conditions precedent to bringing this action have occurred or been fulfilled.

## GENERAL ALLEGATIONS

7.     Plaintiff began employment with Defendant in March, 2016, at FSHP's headquarters in Tallahassee, Florida.

8.      Plaintiff's immediate supervisor, FSHP Operations Director Tamekia Bennett, who hired Plaintiff, began making racially discriminatory remarks toward Plaintiff from the very beginning.

9.      Plaintiff is a white female. Bennett is a Black female.[1]

10.     On Plaintiff's first day on the job, Bennett made a disparaging racial

---

[1] Black is properly capitalized; white is not.
https://www.cjr.org/analysis/capital-b-black-styleguide.php

reference to Plaintiff's name: "Why didn't they just name you Brooke Amanda? That is something only a white person would do."

11.     Thus began a pervasive history of Bennett constantly making racial comments, referring to Ferrell's race and background when making adverse promotion and compensation decisions, and, based on Bennett's well-expressed racial animus, targeting Ferrell by treating her with open hostility, bullying her and harassing her in violation of § 1981.

12.     Early in Ferrell's employment, Bennett told Ferrell that there were two applicants for her position, that the other one was African-American, and that Bennett would have preferred that FSHP hire the other applicant, but that hadn't worked out.

13.     Bennett has generally steered her conversations with Ferrell toward race, even to the extent of criticizing the names of Ferrell's dogs because they had "white people dog names."

14.     In conversations about compensation, raises, or potential promotion, Bennett typically shifted the discussion to Ferrell's race and background

15.     In July of 2017, after nearly a year of outstanding job performance, massive unpaid overtime hours, and expanding job duties, Ferrell provided salary comparisons for comparable job descriptions, using salary.com as requested by Bennett.

3

16.     When she saw the data, Bennett told Ferrell that she was "selfish for such a privileged white person."

17.      Bennett required that Ferrell reduce her salary requests in her annual evaluation before Bennett would pass it on to the Executive Committee.

18.     In August 2017, Bennett and Ferrell were scheduled to meet with the Executive Committee at the FSHP annual meeting in Orlando to discuss Ferrell's annual evaluation and proposed salary.

19.      Before this meeting, Bennett approached Ferrell to inform her that she would not be receiving even the reduced raise that she had ultimately requested.

20.     When Ferrell looked disappointed, Bennett mocked her by asking repeatedly, "What's wrong, why do you have that look on your face?"

21.     When Ferrell did not respond, Bennett approached her and said, "You are getting exactly what you deserve, you have had a privileged life, my family didn't give me the things that your family gave you. I had to work a job in high school. Being black in grade school was hard. You didn't have to deal with these issues because you come from a good, old, white Tallahassee family."

22.     Ferrell left this interaction in tears.

23.     Ferrell was disturbed by this ongoing pattern of aggressive, racially-driven diatribes interspersed with bullying and harassing behaviors, so she sought help from within FSHP. She was terrified that even raising such issues could lead to

4

her losing her job.

24.     Ferrell sought out Larry Gonzales, Esq, who was General Counsel for FSHP in 2017. They had a meeting in September of 2017 to discuss the constant stream of racial comments from Bennett.

25.     Though Gonzalez seemed attentive and had an assistant in the room taking notes, the racial abuse did not diminish and Ferrell heard no result from the meeting.

26.     In July of 2018, Bennett directed Ferrell to submit her proposed annual employment evaluation, which included suggestions for a potential raise based on comparative data.

27.     Upon being presented with the document, Bennett stated, "Oh no, not again. Do you realize that FSHP is not responsible for your financial well-being? My black mother has worked for the city for twenty-five years and she doesn't get a salary increase every year."

28.     At the 2018 FSHP Annual Meeting in Orlando, Ferrell was working alongside Kevin Taylor (a contracted employee). Bennett asked Ferrell and Taylor if they had read the conference manual. Taylor responded that had not; Ferrell stated, "Like Kevin, I have not had time yet." Bennett became irate, aggressively telling Ferrell not to "throw shade at Kevin."

29.     Ferrell was unfamiliar with this term, and asked for clarification.

Bennett stated, "Well, Brooke came in on the white girl short bus today" (vernacular for mental retardation). Bennett and Taylor laughed.

30.   At the August 2019 Annual Meeting of FSHP, an attendee approached Ferrell wearing a "Trump 2020" hat. He wanted a picture with Ferrell, as he had spoken with her over the phone many times. Bennett observed the picture being taken.

31.   Later in the day, the attendee re-approached the registration booth to ask a question, and as he walked away, Bennett stated "We should have made a disclaimer to not allow racist white Nazis to attend our meetings."

32.   In August of 2019, the new FSHP president, Bill Kernan, took office. He was the first FSHP president to reach out to Ferrell. They set up monthly phone calls.

33.   Ferrell expressed many concerns, specifically the continuing racial comments in the context of salary discussions (and beyond). Ferrell stated that she felt that Bennett was on a sustained campaign of bullying and harassment designed to get her to quit.

34.   Kernan told Ferrell that her job performance was excellent and promised to advocate for her compensation to be increased. Ferrell asked directly about the legality of the ongoing racial comments made by Bennett, and never received an answer. Kernan consistently said, "Hang in there, it's going to get

better."

35.     In August of 2020, Jeffrey Bush was elected as president of FSHP. He
and Ferrell also set up regular phone calls in which Ferrell reiterated the same
concerns she had raised with Kernan, emphatically stating that they had fallen on
deaf ears so far.

36.     High on her list of concerns was an increase in aggressive and harassing
behavior from Bennett, seemingly connected to the fact that Ferrell had finally
received a substantial raise in 2020.

37.     Ferrell reported to Bush that she was being bullied at work, and she was
being bulled because she was white.

38.     Bush reported that he had received similar complaints from other
associates of FSHP, and that previous inaction may be due to the fact that there were
"certain presidents that Bennett has been manipulating and controlling."

39.     Bush reported that he had shared Ferrell's concerns with Charzetta
James, a previous president, current treasurer, and personal confidante of Bennett.

40.     At the March 21 strategic planning meeting, James (who is black),
made the following remarks: "I am looking around this room and I see too many
European-Americans…. this will change. I am purposefully and intentionally
seeking only dark-skinned applicants in my professional career…. I would like to
see purposeful and intentional election of dark-skinned members…."

41.     The room was silent.

42.     As treasurer, James holds a position of some influence within FSHP. In the last year, she has made a series of strange phone calls to Ferrell's personal cellphone, seemingly urging Ferrell to be more confrontational with Bennett and to "be bold." This seemed to Ferrell to be an effort to provoke trouble that would result in Ferrell being fired.

43.     In November of 2021, Ferrell was working on the FSHP Mentor/Mentee program, which she administers. Bennett emailed her to instruct her that black people should be matched only with other black people.

44.     At a board meeting in the Fall of 2021, a member made a jocular reference to the "handsome face" of President-elect Jeff Bush, who modestly disclaimed any good looks. Bennett remarked to Ferrell and the person next to her, "I wish I had Jeff Bush's white man face, if I did, I would make $200,000 more than I do."

45.     In early 2022, at a staff meeting attended by Bennett, Ferrell, and Kevin Taylor, a planning discussion arose about the next board meeting. Controversy had arisen over certain inflammatory racial remarks made at the previous meeting by a speaker addressing law enforcement interactions with the black community. The remarks had provoked several complaints from members of all races. Bennett remarked, "I am a Black woman, and you two might not understand this but it was

8

hard to find the correct mixture of races for the four panelists. And by mixture, I mean the darkness of the skin."

46.    Bennett went on to say that Taylor and Ferrell were not qualified to understand and/or make these decisions because they are white. Bennett said that there are different tones of dark skin and she was the only person qualified to determine if a prospective panelist had the correct level of dark skin.

47.    FHSP subjected Ferrell to a pattern or practice of racial discrimination from her first day of employment in March, 2016, through her firing on March 30, 2022.

48.    These practices intensified in 2022 when FSHP leadership acquiesced in a campaign by Bennett to contrive attendance-related issues to build a paper trail to justify firing Ferrell or to harass her so severely that she would quit.

49.    FSHP had only two employees during Ferrell's tenure, with Bennett being the other one.

50.    Both employees were under exactly the same leave and attendance policy.

51.    Bennett's attendance problems are notorious within the organization and have, for years, been the subject of conversations among the FSHP leadership.

52.    Bennett works from home.  Ferrell staffed the office alone.

53.    Bennett is supposed to start her work day at 8:30 a.m., but has arranged,

unilaterally, not to start until noon.  She is frequently absent and late, as has been well-known to FCHP leadership for years.  That leadership has shown no concern for Bennett's attendance and leave derelictions.

54.    For example, Bennett took funeral leave from November, 2018, to January, 2019, for the death of her sister, without having to dip into her paid leave balance.

55.    By contrast, Ferrell kept her assigned hours for six years, often coming early, staying late, and working unpaid overtime.

56.    When Bennett's behavior became more erratic in the form of sending vitriolic and senseless emails at off-hours, Ferrell brought this to the attention of then-President Jeff Bush, who related that he, too, was getting responses, sometimes odd ones, to his morning emails late in the day and that he was discussing this and more with the Executive Committee.

57.    Bush, additionally, reached out to Ferrell to let her know that he was working with Past President Bill Kernan and Treasurer Charzetta James to find a solution for Bennett's erratic behavior and deficient schedule.

58.    Bennett was open about her defiance of attendance policies.

59.    For example, Bennett would tell Ferrell that her kids would be taking swimming lessons and that she would be unavailable during these lessons.

60.    Bennett told Ferrell that Bennett would spend entire days in a beauty

salon, having her hair braided.

61.    Ferrell also noted that Bennett was often in her car during FSHP Council calls.

62.    When the Covid epidemic spread, Ferrell had symptoms and tested negative on the rapid test on or about January 10, 2022.

63.    Though Ferrell worked alone in the office, Bennett refused to allow Ferrell into the office until she got a negative PCR test.

64.    This began a pattern of burning up Ferrell's paid time off for this sort of absence that should be classified as administrative leave or otherwise not counted against the employee's sick leave balance because it was a management-directed absence. The aim was to harass Ferrell into quitting or to build a paper trail to justify firing her.

65.    After the negative PCR test, Bennett ordered Ferrell to take another whole week off against her will, burning up more paid time off (PTO).

66.    When Ferrell got a fever and another negative PCR test, on or about January 25, 2022, Bennett ordered another unnecessary week off.

67.    It became obvious to Ferrell that Bennett was contriving mandatory absences to exhaust all of Ferrell's sick leave and force absences beyond that to fire her for excessive absenteeism.

68.    Ferrell asked permission to double-mask for a short trip to the office to

retrieve a computer to work from home, so she would not keep burning PTO for these forced and unnecessary absences.

69.    Bennett responded that Ferrell was not allowed to work from home and not allowed to go into the office.

70.    Around February 20, 2022, Ferrell had a personal emergency of a private nature and sought two days of PTO.

71.    Bennett contrived a technicality to refuse the leave and to ban Ferrell from work until the executive committee could meet.

72.    The meeting turned out to be a conference call with only Bennett and President-elect Kathy Baldwin.

73.    Baldwin repeatedly pressed Ferrell for the details of her personal crisis until Ferrell tearfully related it.

74.    Baldwin said Ferrell was a "sick person," diagnosed her on the phone as a person whose "neurons were not firing properly," diagnosed that Ferrell needed medication for this neuron misfiring, and that Ferrell needed to see a doctor before returning to work.

75.    Ferrell was already under a doctor's care and had an appointment set in the next few days.

76.    Bennett and Baldwin forced Ferrell to take off another week and a half, burning more PTO.

77.     Ferrell produced a doctor's note confirming her fitness for duty.

78.     Bennett insisted on yet another Executive Committee meeting, which again, was only Bennett and Baldwin.

79.     They placed Ferrell on probation for a bogus list of attendance-related transgressions, stated on a newly-crafted Corrective Action Form.

80.     FSHP had amended its bylaws the previous day and was applying them retroactively to Ferrell's detriment.

81.     Bennett alleged 10 attendance-related violations against Ferrell. The 10 alleged violations were bogus.  Of the three that were actual absences, the issue was timeliness of notice, which was itself pretextual because Ferrell knew not to disturb Bennett before noon.  FSHP cynically parlayed that courtesy into a violation.

82.     Ferrell was able to account for and prove that Bennett had listed her as absent on days that she had not only been present, but had been on conference calls with Bennett, and even provided minutes from these calls to Bennett the same day.

83.     Bennett listed several occasions that Ferrell had not immediately responded to her emails and she listed these as Ferrell being absent when, in fact, Ferrell had been at the office.

84.     Bennett claimed that she was using the intercom that only she was able to use, to check in on Ferrell, and when Ferrell did not respond, Bennett would mark Ferrell as absent.

13

85.    Bennett accused Ferrell of missing work on days that Ferrell had been in the office working with Comcast and Absolute Computing to fix the internet modem, which was going in and out all day, requiring Ferrell to reboot the modem at least once an hour.

86.    Bennett told Ferrell she needed to sign the Corrective Action Form by the next business day.

87.    Ferrell provided specifics for each of the dates that she was incorrectly marked as absent and requested that the Corrective Action Form be canceled as the accusations were proven false.

88.    Ferrell made sure to email the signed version of the Corrective Action Form, with all the proof of the false accusations, to Past President Jeff Bush, President Elias Chahine, Treasurer Charzetta James, Incoming Treasurer Dave Lacknauth, Bennett and Baldwin.

89.    Ferrell included a second request for the Corrective Action to be removed, due to the false accusations. Ferrell did not receive any replies from anyone but was fired shortly thereafter.

90.    But for Ferrell's race and her opposition to the racial discrimination against her, Ferrell would not have been the target of the campaign to fire her by contriving bogus allegations related to leave and attendance.

91.    Though Bennett was the architect of the racist campaign, the whole

association leadership was complicit in it.

92.    FSHP has a history of negligently retaining and supervising staff.  This continued through the negligent retention and supervision of Bennett leading up to the racist and retaliatory firing of Ferrell.

93.    Bennett's immediate predecessor, Pamela White, over a period of time, managed to embezzle $306,405 in FSHP funds from under the nose of FSHP leadership, including Bennett, who was at that time in the job later held by Ferrell.

94.    Neither FSHP nor Bennett exercised the due diligence or the basic concern for the operation necessary to protect the members victimized by the embezzlement by White.

95.    White's example taught Bennett that FSHP's officers would not take the time from their busy practices, mostly outside Tallahassee, to perform their fiduciary duties of oversight of the operations of their state office.

96.    FSHP permitted Bennett to delegate essentially her whole job to Ferrell and to spend her paid hours in hair salons, recreational activities, family pursuits and the like, while showering Ferrell with racist vitriol and retaliating with transparently contrived discipline upon meeting resistance to the racist persecution.

97.    Bennett spent an inordinate amount of time on her personal litigation, including her divorce proceedings and a fruitless and persistent effort with her husband to obtain a no-contact injunction against a woman.  Leadership was aware

of Bennett's derelictions of duty, absenteeism, and failure to perform, but overlooked these transgressions, even while exaggerating the minor absences of Ferrell to the point of fabrication and mendacity.

98.     As shown above, Ferrell diligently informed numerous FSHP officers of Bennett's derelictions.  These notices served only to induce certain of the officers to join in the retaliation.

99.     Plaintiff has had to retain counsel to vindicate her rights in this matter and owes a reasonable attorney's fee and litigation costs.

## COUNT I – 42 U.S.C. § 1981
## CIVIL RIGHTS ACT OF 1866
## RACE DISCRIMINATION

100.     Plaintiff realleges paragraphs 1 through 99.

101.      Plaintiff is white and is thus a member of a protected class.

102.      Plaintiff has suffered discrimination based on race as well as a hostile environment based on race.

103.     The racially harassing conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find her work environment to be hostile or abusive.

104.     Plaintiff found her work environment to be hostile or abusive as a result of Defendant's agents' and employees' conduct.

16

**105.**     Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management-level personnel with information sufficient to raise a probability of discrimination and harassment in the mind of a reasonable employer.

106.     Defendant did not exercise reasonable care to prevent discrimination in the workplace and did not exercise reasonable care promptly to correct any discriminatory behavior there.

107.     Plaintiff's race was the determining factor in Defendant's actions.

108.     The foregoing actions of Defendant and its agents and employees constitute unlawful action, including discharge, against Plaintiff in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

109.     Plaintiff has suffered damages because of Defendant's actions.

<u>**COUNT II – 42 U.S.C. § 1981**</u>
**CIVIL RIGHTS ACT OF 1866**
**RETALIATION**

110.     Plaintiff realleges paragraphs 1-99.

111.     Plaintiff engaged in protected conduct by objecting to the race-based animus directed at her by Defendant's agents and employees.

112.     Defendant took adverse actions against Plaintiff because of her protected conduct.

113.     The foregoing actions of Defendant constitute retaliation against Plaintiff in violation of the Civil Rights Act of 1866.

114.     The retaliation described herein was based on Plaintiff's exercise of rights protected by law to resist and oppose race discrimination and harassment and to participate in actions calculated to redress those grievances.

**115.**     Plaintiff has suffered damages because of Defendant's actions.

## COUNT III – NEGLIGENT TRAINING, SUPERVISION, AND RETENTION

116.     Plaintiff realleges paragraphs 1-99.

117.     Defendant had a duty to train its supervisory employee, Bennett, to obey the law against racial discrimination and retaliation for opposition to racial discrimination.

118.     Defendant breached its duty to train Bennett.

119.     Plaintiff was damaged by Defendant's breach of its duty to train Bennett.

120.     Defendant had a duty to supervise its supervisory employee, Bennett, to assure she obeyed the law against racial discrimination and retaliation for opposition to racial discrimination.

121.     Defendant breached its duty to supervise Bennett.

122.     Plaintiff was damaged by Defendant's breach of its duty to

supervise Bennett.

123.     Defendant had a duty to terminate its supervisory employee, Bennett, for her repeated failure obey the law against racial discrimination and retaliation for opposition to racial discrimination

124.     Defendant breached its duty to terminate Bennett.

125.     Plaintiff was damaged by Defendant's breach of its duty to terminate Bennett.

## **PRAYER OF RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a)     that process issue and this Court take jurisdiction over this case;

b)     judgement against Defendant and for Plaintiff awarding compensatory and punitive damages on all Counts for the Defendant's violations of law enumerated herein;

c)     judgement against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein and reinstatement for the Plaintiff, remedying all benefits of which Plaintiff has been unlawfully deprived;

d)     prejudgment interest;

e)     judgement against Defendant and for Plaintiff awarding Plaintiff her attorney's fees and costs;

f)    all equitable relief that is allowed by law;

g)    such other and further relief as is appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Filed this 12th day of July, 2022.

Respectfully submitted,

_/s/Richard E. Johnson_
Richard E. Johnson, Bar No 858323
LAW OFFICE OF RICHARD E. JOHNSON
rick@rej-law.com
314 West Jefferson Street
Tallahassee, Florida 32301
Telephone: (850) 425-1997
Facsimile: (850) 561-0836